**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DENKEWALTER & ASSOCIATES, LTD., d/b/a DENKEWALTER & ANGELO, and KIM R. DENKEWALTER, <br><br> Plaintiffs, <br><br> v. <br><br> COLE TAYLOR BANK, <br><br> Defendant. | No. 10 CV 4899 <br> Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Denkewalter & Associates, Ltd. ("D&A") and Kim R. Denkewalter ("Denkewalter") bring this action against Defendant Cole Taylor Bank ("Defendant" or "Cole Taylor"). Plaintiffs claim state law negligent misrepresentation (Count I), conversion (Count II), and a violation of Illinois's Consumer Fraud and Deceptive Business Practices Act (Count IV). The federal allegations come under the Electronic Funds Availability Act, 12 U.S.C. § 4001 *et seq.* ("EFAA") and its implementing regulation, known as "Regulation CC." *See* 12 C.F.R. § 229.33, 229.38.

For the following reasons, I find that Plaintiffs have failed to state a federal cause of action. Therefore, Count IV is dismissed under Rule 12(b)(6) and I decline to exercise supplemental jurisdiction over the remaining state law claims.

I. BACKGROUND

Viewed in the light most favorable to the non-movant, the relevant facts are as follows. D&A is a law firm located in Skokie, Illinois. Denkewalter is a lawyer in the firm. Defendant Cole Taylor Bank is an Illinois bank with offices, among other places, in Skokie.

D&A used Cole Taylor as its bank. Specifically, D&A maintained an Interest on Lawyers Trust Account ("IOLTA") and an operating account at Cole Taylor. Kim Denkewalter does not maintain an individual account at Cole Taylor.

D&A - along with others - fell victim to a fraudster. On or about May 10, 2010, a long time friend of Denkewalter who was also a licensed real estate agent referred a person identified as "Mr. Z" to Denkewalter's firm. Mr. Z represented himself as being interested in purchasing a home in Hawthorn Woods, Illinois. After conducting some due diligence as to Mr. Z's identity and finances, D&A took on Mr. Z as a client for the purpose of completing the transaction. On May 12, 2010, Mr. Z signed his engagement letter with D&A.

To facilitate the payment of earnest money and other expenses associated with the purchase, Mr. Z sent a check to D&A dated May 12, 2012 for $150,000. The check was drawn on the account of Cassels, Brock, and Blackwell, LLP, a Canadian Law Firm, at the Bank of Nova Scotia. Denkewalter had the check deposited in D&A's IOLTA account at Cole Taylor on May 17, 2010.

In the meantime, the details of the home purchase were being finalized. On May 20, 2010, Mr. Z and the seller settled on a purchase price for the home. The closing was set for June 25, 2010 and earnest money in the amount of $15,000 was to be due on May 25, 2010.

On the same day these terms were finalized, May 20, 2010, Mr. Z sent D&A an email in which he indicated how he wanted his $150,000 in funds to be used. $30,000 was to be for "payment on the property," while the remaining $120,000 was to be wired to a bank in Japan. Mr. Z wanted the larger sum to go toward "Chinese home style furniture, Chinese style home entertainment, Chinese home decoration and Chinese kitchen appliance in Japan that [Mr. Z] will

2

be bringing to this property I love my tradition and I want my home to look like little China Mansion." The Japanese bank account information was purportedly the receivables account of a furniture company in Japan.

In response to Mr. Z's May 20 email, Denkewalter did two things. First, she logged onto the IOLTA account information at Cole Taylor's website. The $150,000 was available in the account. The second thing Denkewalter did was to contact Elizabeth Riesche. Riesche was a Vice President and Relationship Manager at the Skokie branch, and had served as D&A's primary contact at Cole Taylor. Denkewalter asked Riesche on May 20 if she could assist with Mr. Z's desired transfer, and Riesche said she could.

Denkewalter proceeded to the Skokie branch that same day and met personally with Riesche. Denkewalter showed Riesche the email from Mr. Z in which he described his intentions for the money and provided the Japanese account information. Before proceeding, Denkewalter also asked, in the words of the complaint, "to confirm again that Mr. Z's $150,000 in funds from the purported Cassels Brock & Blackwell LLP check, which had been deposited three days earlier, were indeed in the account and could be wired out immediately without risk of any problems." In response, Riesche told Denkewalter in person at the meeting that the funds had been "received" and deposited in D&A's IOLTA account and that the funds were therefore safe to wire to Japan. After this assurance, Riesche conducted the wire transfer.

On May 22, 2010, Mr. Z again contacted D&A. He directed a partial disbursement of the $30,000 remaining in the IOLTA account as follows: $15,000 to the seller as earnest money, $500.00 to D&A as a retainer, $500.00 to Amerispec (a home inspector) and $275.00 to Cornerstone Residential Appraisals.

3

On June 2, 2010 the Bank of Nova Scotia informed Cole Taylor that the check drawn on the Cassels, Brock & Blackwell LLP account was a "counterfeit item"[1] and that therefore they (the Bank of Nova Scotia) were charging back the $150,000. Cole Taylor in turn charged back the money from D&A's IOLTA account, leading to a shortfall of $126,312.13. Cole Taylor seized other D&A funds on hand to cover the amount.

Cole Taylor and D&A could not agree on a resolution. The bank therefore sued the law firm in Illinois state court, and D&A and Denkewalter brought this action.

II. STANDARD OF REVIEW

With exceptions not relevant here, complaints asserting claims for relief in the federal system are governed by the notice pleading standard of Rule 8. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). A motion under rule 12(b)(6) requests dismissal of a complaint, or a claim within a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P 12(b)(6). Such motions test the legal sufficiency of the complaint, not the underlying factual merits. *Christensen v. County of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). I must take all facts alleged in a plaintiff's complaint as true and draw all reasonable inferences from those facts in favor of that plaintiff. *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir.2007). Plaintiffs need not plead particularized facts, but the factual allegations in the complaint must be enough to raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n. 14 (2007). Plaintiffs must plead their facts so that, when accepted as true, they show the plausibility of their claim for relief. *Ashcroft v. Iqbal*, 129 S.Ct.

---

[1] Cassels, Brock, & Blackwell LLP was the target of a sequence of similar frauds, ultimately prompting them to post a notice on their website to be wary of checks bearing their name.

1937, 1949 (2009). In short, a complaint governed by Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

III. ANALYSIS

A. The EFAA and Regulation CC

The EFAA regulates the time banks may take in making deposit funds available to account holders. *See* 12 U.S.C. § 4001 *et seq*; *see also Bank One Chicago, N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 266 (1996) (EFAA was "designed to accelerate the availability of funds to bank depositors."). Congress's aim in passing EFAA in 1987 was to alleviate a then-common problem in which a customer deposits checks in a bank, waits a few days, then writes checks on the account, only to find out that their own checks had not cleared despite the wait. S. Rep. No. 100-19, at 25-26 (1987).

EFAA empowers the Board of Governors of the Federal Reserve System to create implementing regulations. 12 U.S.C. § 4008. Relevant here is Subpart C of Regulation CC governing collection of checks. *See* 12 C.F.R. § 229.30 *et seq.* In particular, § 229.33 requires a depositary bank (here, Cole Taylor) to alert customers of returned checks by midnight of the banking day following the banking day on which it receives notice from the paying bank (Bank of Nova Scotia). Additionally, § 229.38 commands that

> A bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank, the depositary bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care. A bank that fails to act in good faith under this subpart may be liable for other damages, if any, suffered by the party as a proximate consequence.

12 C.F.R. § 229.38.

B. Liability under 12 C.F.R. § 229.33

There is no viable claim under § 229.33. Plaintiffs argue that Defendant violated the requirement to notify them by the next banking day that Mr. Z's check was counterfeit, as required by Regulation CC. On its face, this sounds like a strange allegation, given that Plaintiffs themselves submitted the Bank of Nova Scotia's notice to Cole Taylor, which was dated June 2, 2010 and have conceded that Cole Taylor notified them on the same day. However, essentially, pleading in the alternative, Plaintiffs submit an additional exhibit tending to show that certain officers of the bank may have had notice earlier than this apparently uncontroversial date. The exhibit is a filing submitted by Cole Taylor's General Counsel, Steven Shapiro, to a state agency. In that filing, Mr. Shapiro recounted the incident as follows:

> Mr. Denkewalter wired $120,000 to China three days after he deposited a $150,000 check in his IOLTA account with the Bank. Mr. Denkewalter client's [sic] apparently wanted to furnish his entire home in Oriental furniture, and Mr. Denkewalter was handling the transaction for him.
>
> *Two days later*, the Bank was notified that the deposited check was being returned as counterfeit.

Compl. Exh. M. (emphasis added).

Plaintiffs submit that the emphasized language means one of two things. First, that Cole Taylor had notice of the bad check on May 19, two days after Denkewalter deposited in the IOLTA account; or second, that the bank had notice on May 22nd, two days after the May 20th wiring of the money.

The first reading must be rejected as simply implausible. The second reading, however, briefly presents a problem for Cole Taylor. If the bank knew of the counterfeit nature of the

check on May 22nd and did not notify Plaintiffs until June 2, that is an obvious violation of § 229.33's notice provisions.

Yet there remains no federal claim, because Plaintiffs have pled themselves out of court with respect to damages. Section 229.38 defines the damages for the subpart under which § 229.33 falls. *See* 12 C.F.R. § 229.38. Those damages are measured as "the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care." *Id.* at § 229.33. The reduction clause is what dooms Plaintiffs' claim. Even given a May 22nd notice date to Cole Taylor, the wire to the foreign bank had already occurred, on May 20th. The damage was done, and no amount of notification would have cured it. Plaintiff can make no recovery for a notice violation under 12 C.F.R. § 229.33.

C. Liability under 12 C.F.R. § 229.38.

Courts have consistently held that EFAA was intended to cover the "timing of availability of deposited funds," but not "erroneous representations by the bank concerning the status of a transaction." *Beffa v. Bank of the West*, 152 F.3d 1174, 1177-78 (9th Cir. 1998). *See also, e.g. Lynch v. Bank of America, N.A.*, 493 F. Supp. 2d 265, 269 (D.R.I. 2007) ("[A]s long as depositary institutions comply with its notice provisions . . . [EFAA] does not make banks liable for their customers' checks. EFAA requires institutions to make the funds available, but it does not require a bank to effectively become a guarantor of the check in the process.")

*Beffa* is instructive on this point, and I find its holding and reasoning with respect to Regulation CC persuasive. In *Beffa*, the plaintiff was set to receive funds wired from a foreign corporation. *Id.* at 1175. The corporation honored its commitment, but the depositary bank

negligently deposited the funds in an unrelated account. The bank repeatedly and wrongly assured the plaintiff that the funds had simply never come into the bank in the first instance. This led to predictable mistrust and strife between the plaintiff and his erstwhile corporate partner, and only after more than two years did the bank recognize and admit its error. *Id.* at 1176. Seventh Circuit Judge Harlington Wood, Jr., sitting by designation in the Ninth Circuit, wrote that while the plaintiff may have had an EFAA claim because the funds were not made "available" under EFAA's timing provisions (a claim that, under the facts of the case, was time-barred), there could be no EFAA liability based on the egregious negligence and misrepresentations by the defendant bank in placing customer funds in the wrong account and insisting that such funds had never arrived. *Id.* at 1176. The court pointedly held that claims rooted in "intentional and negligent misrepresentation...involve elements that are beyond the scope of EFAA." *Id.* at 1178.

Though the particulars are different here - the alleged damages here stem from Cole Taylor's assurances that it *did* have the funds, unlike in *Beffa* where the opposite inaccurate assurance was made - the outcome must be the same. The bank made material misrepresentations, which misrepresentations harmed Plaintiffs, but those misrepresentations cannot lead to liability under the EFAA.

A final point regarding EFAA's statutory scheme was not addressed by the parties, but does shed light on the issue, if not disposing of it entirely. EFAA's miscellaneous provisions section states that:

> No provision of this chapter shall be construed as . . . (2) affecting a depository institution's right - (A) to accept or reject a check for deposit; (B) to revoke any provisional settlement made by the depository institution with respect to a check

>accepted by such institution for deposit; (C) to charge back the depositor's account for the amount of such check; or (D) to claim a refund of such provisional credit.

12 U.S.C. § 4006( c). The language of the statute is clear and creates no exception for cases in which the bank makes inaccurate assurances or outright misrepresentations regarding the account. A finding of liability here would certainly curtail a bank's right to charge back an account that was credited by counterfeit check. *See generally Lynch v. Bank of America, N.A.*, 493 F. Supp. 2d 265, 268-69 (D.R.I. 2007) (citing *Essex Constr. Corp. v. Indus Bank of Washington, Inc.*, 913 F.Supp. 416, 418 (D. Md. 1995)).

D. Declination of Supplemental Jurisdiction

The parties are not diverse, so any jurisdiction here is premised on 28 U.S.C. 1331 (federal question jurisdiction) and 28 U.S.C. 1367 (supplemental jurisdiction for the state law claims). When federal claims are dismissed, 28 U.S.C. 1367(c)(3) provides that a district court may decline supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Dismissal in this circumstance is subject to my discretion, *see Schor v. City of Chicago*, 576 F.3d 775, 779-80 (7th Cir. 2009), and I exercise that discretion here. No federal claims remain, and this case is not close to trial.

IV. CONCLUSION

In conclusion, I note that the general tone and tenor of Plaintiffs' arguments is that a wrong has been likely done to them and that a remedy should follow. They have made a strong argument that they were wronged, it is just that the remedy is not to be found in the federal Electronic Funds Availability Act, but in state tort and statutory law.

The claims under EFAA are dismissed, with prejudice. I decline to exercise my supplemental jurisdiction over the state law claims, so those claims are dismissed from this court without prejudice.

                                              ENTER:

                                              *[signature]*
                                              James B. Zagel
                                              United States District Judge

DATE: July 27, 2011